(November 19, 2015)

■ The People of the State of New York, Respondent, v Jennara Cobb, Appellant. [21 NYS3d 14]—

Judgment, Supreme Court, Bronx County (Martin Marcus, J.), rendered December 18, 2014, convicting defendant, after a

nonjury trial, of divulging an eavesdropping warrant, official misconduct, and obstructing governmental administration in the second degree, and sentencing her to a conditional discharge with the performance of 200 hours of community service, unanimously affirmed.

Penal Law § 250.20 states as follows: "A person is guilty of divulging an eavesdropping warrant when, possessing information concerning the existence or content of an eavesdropping warrant . . . , he discloses such information to another person." The trial court, prior to rendering its verdict, explained that "knowledge, actual knowledge, is required," and rejected the People's argument that mere rumor would be enough to satisfy the requirements for the divulging count. On appeal, viewing the evidence in the light most favorable to the People, the evidence was sufficient for the trial court to conclude that defendant divulged information concerning the existence and content of an eavesdropping warrant (see People v Gordon, 23 NY3d 643, 649 [2014]), and we see no reason to set the verdict aside as against the weight of the evidence (see People v Danielson, 9 NY3d 342, 348-349 [2007]).

Defendant, a New York City police officer, was assigned to the Internal Affairs Bureau (IAB) from August 2006 to July 2009. During that time, defendant was assigned to the "Barber Shop Operation." The operation was investigating a drug dealer who was selling drugs out of barbershops and a police officer who owned the barbershops, both of whom the police believed "were in a ring regarding the sale of marijuana." Defendant was directly involved in the investigation, as she participated in obtaining the initial wiretap, monitored the wiretap, signed a confidentiality letter, interviewed the dealer and others, and was a sounding board for the supervising detective of the investigation. One month after defendant left IAB, a wiretap "went up" on the officer who owned the barbershops. This wiretap led to information of ticket fixing between the target officer and other delegates of the Patrolman's Benevolent Association. In December 2009, this information resulted in the expansion of the initial investigation to include subsequent wiretaps on delegates regarding ticket fixing. The common denominator between all these wiretaps was the target officer.

On February 4, 2010, defendant went to a bar with a police captain, who then invited another police officer, who was not the target on the prior wiretaps. This officer was known as "K-Mac." Despite defendant meeting K-Mac for the first time, upon his introduction as a delegate, defendant disclosed that there was an investigation involving corrupt cops fixing tickets

for drug dealers. She noted that a delegate might be involved, and advised the officers to be careful on the phones. K-Mac, while driving home afterwards, called another delegate officer to meet at a different bar. K-Mac then told that delegate officer that he had just heard about corrupt cops fixing tickets, that a delegate might be involved, and that he should be careful on phones. The trial evidence showed that this information was repeated to a trustee, who subsequently told all the Bronx delegates at a side meeting that they should be careful on the phones, that they should stay off the phones, and that ticket fixing should be conducted face-to-face. The next day, IAB intercepted a call on one of their wiretaps, where two delegates informed one another that IAB was listening to their calls and that all ticket fixing business by phone had to stop.

After hearing this conversation about avoiding phones, and other conversations on wiretaps about ways to attempt to circumvent any wiretaps, IAB knew it had a leak. By June 2010, the supervising detective began to suspect defendant was leaking information. In June 2010, defendant spoke to the supervising detective on the phone, and she brought up an incident at St. Barnabas Hospital and asked whether he had heard about it. He decided to plant information by acknowledging to defendant that he had heard of it, even though he had only heard about the melee by listening to wiretapped conversations. Three to four days later, he listened to an intercepted call between several delegates, who were previously connected to defendant. One of them said he saw K-Mac at a bar, and K-Mac spoke to the "girl from the four-eight" who said she thought a delegate's phone "is wired, tapped" because "the guy that she knows that works there" knew about St. Barnabas. The testimony at trial provided a sufficient basis for the court to have concluded that defendant was "the girl from the four-eight" since she was assigned to that precinct after she left IAB.

Defendant's arguments on appeal about the weight and sufficiency of the evidence were properly considered and rejected by the trial court, who was the trier of fact. Her principal point on appeal is that she was merely repeating rumors, gossip, or speculation, and that she did not possess information regarding the existence or content of a wiretap. This issue was resolved against her by the trial court, and there is no basis to disturb its findings. The trial court's conclusions on the remaining counts were based on the same evidence as the divulging an eavesdropping warrant count, and also should be affirmed on appeal. Concur—Tom, J.P., Acosta, Richter and Kapnick, JJ.